# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**LEAH H. WILKERSON,**

      **Plaintiff,**

**vs.**                          **Case No.  1:16cv338-CAS**

**NANCY A. BERRYHILL, Acting
Commissioner of the Social Security
Administration,**

      **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This Social Security case was referred to the undersigned upon consent of the parties, ECF No. 14, by United States District Judge William Terrell Hodges.  ECF No. 16.  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration denying Plaintiff's application for a period of disability and Disability Insurance Benefits (DIB) benefits pursuant to Title II of the Social Security Act.  *See* ECF No. 1.  After careful consideration of the record, the decision of the Commissioner is affirmed.

## I. Procedural History and Facts

On December 7, 2012, Plaintiff, Leah H. Wilkerson, filed an application for a period of disability and DIB benefits, alleging disability beginning October 4, 2012. Tr. 18, 149.[1] The application was based on neck and back pain, headaches, fibromyalgia, anxiety, depression, temporomandibular joint (TMJ) dysfunction, and toe pain. Tr. 42, 184. The application was initially denied on March 25, 2013, and again on reconsideration on July 16, 2013. Tr. 18, 96-101,106-11.

Pursuant to Plaintiff's request for a hearing, a hearing was held on April 22, 2015, in Ocala, Florida, before Administrative Law Judge (ALJ) Arline Colon.[2] Tr. 18, 35-65. Plaintiff was represented at the hearing by paralegal representative Archie S. Blair, and is also represented by counsel in this case. Tr. 18, 35, 148. Plaintiff and David Jackson, Ph.D., an impartial vocational expert, testified at the hearing. Tr. 18, 35-65.

---

[1] Citations to the transcript/administrative record (ECF Nos. 10, 10-1 through 10-11) shall be by the symbol "Tr." followed by a page number that appears in the lower right corner of each page.

[2] At the outset of the hearing, Plaintiff's representative advised the ALJ that they were waiting for records from "Dr. Daniel Hoh, a neurologist. Tr. 37. The ALJ kept the record open. Tr. 37, 64-65. Without objection, the ALJ admitted Exhibits 1A through 10F. Tr. 31-34, 37. Exhibits 11F through 16F were provided after the hearing, but before the ALJ's decision. Tr. 34.

The ALJ issued a decision on September 4, 2015, finding that Plaintiff retained the residual functional capacity (RFC) to perform light work, with certain exceptions, and that she could perform a significant number of jobs in the national economy.  Tr. 18-30.  Plaintiff requested review from the Appeals Council and submitted additional evidence (Exhibit 17F).  Tr. 5, 13, 562-68.  The Appeals Council denied review on September 7, 2016, noting that it considered the reasons Plaintiff disagreed with the ALJ's decision and the additional evidence listed in the order, but found no basis to depart from the ALJ's decision.  Tr. 2-4.  Plaintiff filed her Complaint in this Court on November 7, 2016, ECF No. 1, and the Defendant filed an answer on January 19, 2017.  ECF No. 9.  The parties each filed memoranda of law, which have been considered.  ECF Nos. 13, 19.

### A.  Medical Records

The medical records show that in March 2009, Plaintiff had anterior cervical discectomy and fusion (ACDF) at C4-5 and C5-6 performed by Eric Scott, M.D.  Tr. 263, 275.  An MRI scan at the time demonstrated osteophyte complexes with moderately severe spondylostenosis at C4-5 and C5-6.  Tr. 275.  In August 2009, Dr. Scott noted that an MRI of the thoracic spine showed disc protrusion at T10-11 with right-sided cord compression.  Tr. 274.  On January 19, 2010, Plaintiff was given cervical

spine X-rays and a cervical spine MRI after a fall, which showed mild

degenerative changes at C6-7 below the fusion.  Tr. 269.  Office notes for

January 19, 2010, indicate 2/5 weakness in the left grip and 3/5 weakness

in the left biceps.  Right sided strength was intact.  Tr. 270.  The Spurling's

maneuver to the right caused left arm pain, and was positive to the left.  *Id.*

Dr. Scott saw Plaintiff on January 20, 2010, and noted that previous grip

weakness was improved at 4 to 4+/5.  At that time Plaintiff had some

numbness in her left arm and weakness in her grip.  Tr. 269*.*

During 2011, Plaintiff was treated numerous times for migraines,

severe headaches, and hypertension.  Tr. 250-61; 283-303; 306-08; 309-

11; 315-35; 341-42; 384-90; 394-96; 420-29.  In June 2011, Plaintiff was

diagnosed with asthma.  Tr. 301-03.  Migraines and severe headaches

continued in 2012, and Plaintiff was diagnosed with anxiety disorder and

insomnia.  Tr. 292-94.  She was seen on April 23, 2012, for depression,

with symptoms including loss of interest, depressed mood, fatigue, poor

sleep, headache, irritability, and anxiety.  Tr. 286-88.

On August 3, 2012, Plaintiff was seen at Dr. Scott's office.  Tr. 263-

68.  She presented with progressive neck pain with radiation into both arms

down to the hands, with the left arm worse than the right.  Tr. 267-68.  The

examination showed her cranial nerves were intact bilaterally.  Tr. 267.

She had trace weakness in her grip, but other muscle groups appeared intact. Tr. 268. Her gait was normal, with normal heel, toe, and tandem walking. Her reflexes were 3+ throughout and symmetric. *Id.* She was diagnosed with progressive cervical brachial pain and status post-fusion of C4-6 in 2009. *Id.*

Dr. Scott treated Plaintiff on August 14, 2012, for neck pain with radiation into both arms and intermittent numbness in the right arm. Trace weakness in the grip was revealed. Tr. 263-68. She had markedly positive Tenel's sign at the left elbow. Tr. 263. A recent MRI showed evolution of disc osteophyte complex at C6-7 with moderate right foraminal stenosis. Tr. 264-65. Plaintiff was diagnosed with cervical spondylosis at C6-7, cervical brachial pain, and left ulnar neuritis, and was referred to physical therapy and occupational therapy. Tr. 263.

Plaintiff's headaches continued in 2012, and in October 2012, she was treated by Elizabeth C. Sanders, D.O., for several complaints, including headaches and depression. Tr. 279-82. Dr. Sanders noted Plaintiff's appearance as unkempt, anxious, and depressed. Tr. 281. In February 2013, Dr. Andrew Ahn treated Plaintiff for headaches and high blood pressure. Tr. 410-19.

A consultative examination of Plaintiff was made on March 19, 2013, by Dr. Lance Chodosh.  Tr. 432-39.  He noted that the leg raise was negative to 90 degrees on the left while supine, but could not be assessed on the right while supine due to general pain.  Straight leg raise was negative to 90 degrees while sitting.  Tr. 434.  Motor function was found grossly normal, all four extremities, with strength judged 5/5 throughout, including grips.  Manual dexterity was found to be normal with ability to write, and to remove and replace a screw cap on a small bottle.  *Id.*  Plaintiff's coordination was good and sensation was normal to soft touch, but decreased in both lower legs on medial aspects of the ankles and posterolateral aspects of her feet.  *Id.*  Testing showed limited range for cervical spine forward flexion and limited range in lumbar spine forward flexion.  Tr. 436.  Standing balance and gait was normal and Plaintiff indicated an ability to squat and rise, although squatting was difficult due knee pain.  Tr. 433, 435.  She is able to drive with frequent rest breaks.  Tr. 433.  Dr. Chodosh's impressions and comments included chronic generalized pain, headaches, and potential mental health issues.  Tr. 435.  He concluded that based on the objective evidence, Plaintiff could stand, walk, sit, stoop, squat, kneel, lift, carry, handle objects, see, hear, and speak normally.  *Id.*  He stated, "No abnormal physical findings noted."

Tr. 435.

The agency also ordered a consultative examination of Plaintiff by

William Beaty, Ph.D., a licensed psychologist, which occurred on March 20,

2013.  Tr. 441.  Dr. Beaty reported Plaintiff to be depressed and anxious,

with a sad, constricted, and flat affect.  Tr. 442.  Based on information

provided by Plaintiff, the records, and the interview, Dr. Beaty diagnosed

Plaintiff with major depressive disorder without psychotic features, and

generalized anxiety disorder.  She was assigned a Global Assessment of

Functioning (GAF) score of 45 out of a range of 100 (superior functioning)

to 1 (persistent danger of severely hurting self or others, or unable to care

for self).[3]  Tr. 443.  Dr. Beaty noted that Plaintiff's ability to do work-related

---

[3] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).  A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *See* DSM-IV-TR at 34.  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  *Id.*  A GAF scale rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-

tasks included problems with sitting and walking for longer periods, problems with concentration and memory due to pain, and a tendency to be reclusive. *Id.*

The medical records show that on March 26, 2013, Plaintiff was treated at Shands Hospital emergency department for worsening neck and back pain and high blood pressure. Tr. 445-55. The notes state that Plaintiff was positive for myalgias and back pain, but negative for gait problem, numbness, headaches, and paresthesia. Tr. 447. She exhibited normal range of motion. Tr. 448. Her mood and affect were normal. *Id.*

Plaintiff saw Dr. Scott again on March 27, 2013, and was found to have limited range of motion in her neck, with some palpable spasm and tenderness on the left. Tr. 465. Spurling's maneuver was equivocal bilaterally. She was diagnosed with recurrent cervical brachial pain, possible progression of spondylosis at C6-7, lupus, and possible left ulnar neuritis. *Id.* She was referred to vocational rehabilitation and an MRI. *Id.*

---

65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th Ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16.

Plaintiff was treated at Meridian Behavioral Healthcare, Inc., on April 17, 2013, where she received a psychiatric evaluation. Tr. 460-63. She was found to have a depressed mood, anxious affect, lack of interest and energy, frequent crying, poor concentration, and poor sleep. Tr. 460-62.

A March 28, 2014, MRI on Plaintiff's thoracic spine due to mid back pain showed mild disc herniation at T10-11 with mild compression and moderate spinal cord displacement. Tr. 477. The record contains a report of an MRI on Plaintiff's cervical spine on February 17, 2014, which revealed at C6-7 stable mild posterior disc bulge/osteophyte complex and uncovertebral joint degenerative changes resulting in very mild stenosis and bilateral foraminal narrowing, mild on the left and moderate on the right. Tr. 478.

On May 23, 2014, on referral from Dr. Scott, Dr. Daniel Hoh examined Plaintiff for mid back pain, at which time she reported some paresthesia around the left flank as well as her left leg. Tr. 502-07. Dr. Hoh found no signs of myelopathy and noted that she has had the thoracic disc herniation since 2009. Tr. 502. Dr. Hoh recommended against surgical treatment for the thoracic disc herniation at that time as it was unlikely to relieve her symptoms. She was referred for pain management consultation. *Id.*

On June 18, 2014, Plaintiff was seen as a new patient by Gregory L. Stamper, D.O., for back pain and for hypertension. Tr. 480. Plaintiff appeared oriented to time and place, with normal mood and affect. Dr. Stamper reported decreased flexion and decreased extension, and also noted that past pain medications had been ineffective. Tr. 481.

Dr. Stamper saw Plaintiff again in September 2014 due to increasing neck and mid back pain. He reported decreased flexion, decreased extension, decreased lateral bending, and decreased rotation. Tr. 485. Plaintiff was prescribed oxycodone for pain and Lisinopril for hypertension. *Id.* In October 2014, Dr. Stamper saw Plaintiff in a follow-up and reported that the pain had reduced somewhat with the opiate medication. Her pain medication was continued. Tr. 487-88. In her November 2014 appointment with Dr. Stamper, Plaintiff reported increased pain and several other problems relating to her sinus. Tr. 491. The office notes report tender cervical spine, tender thoracic spine, decreased extension, and decreased lateral bending. Tr. 492. Her pain medication was continued and antibiotics were prescribed. *Id.* Plaintiff was seen at the Ocala Health System emergency room on November 15, 2014, for migraine. She was diagnosed with headache, nausea, and vomiting and was prescribed Zofran. Tr. 509-15.

Plaintiff's December 2014 visit with Dr. Stamper revealed increased pain and acute upper respiratory infection symptoms. Plaintiff's oxycodone prescription was continued. Tr. 496. Her decreased extension and lateral bending was again noted. *Id.* After Plaintiff's January 2015 visit for a medication refill, Dr. Stamper noted, "Leah presented today ostensibly for refill on pain medication. I confronted her with results of her random urine drug screen done last month, and explained it to the positives are (sic) no longer able to write pain medication for her." Tr. 499.

In February and March of 2015, Dr. Scott treated Plaintiff again for neck pain. Tr. 530-31. On February 17, 2015, she reported falling at home having increased left cervical brachial pain. *Id.* Dr. Scott's office notes for February 17, 2015, state that he referred Plaintiff to Dr. Hoh in April 2014 after she was found to have thoracic disc herniation of T10-11, but Dr. Hoh recommended against surgery at that time. Tr. 531. On March 20, 2015, Dr. Scott reviewed the cervical MRI study done on March 10, 2015. Tr. 530. He recommended ACDF surgery at that time at C6-7 using PEEK cage and LDR-ROI-C system. *Id.* He noted rather severe foraminal narrowing on the right and moderate on the left, which "undoubtedly accounts for her C7 radicular pain." *Id.*

Plaintiff was injured in an automobile collision on June 21, 2015, causing the vehicle in which she was riding to flip.[4]  On June 24, 2015, Plaintiff was seen by Kim Nguyen, PA-C, supervised by Adrian Lewis, M.D., at Medig medical injury group.  Tr. 535.  Plaintiff reported losing consciousness in the accident, although she was seen by paramedics at the scene and released.  *Id.*  Plaintiff had bruising on her hip, and lacerations and abrasions her hand.  She also reported TMJ pain, cervical, thoracic, and lumbar pain, as well as shoulder pain.  *Id.*  Plaintiff was seen by Medig again on June 30, 2015, concerning the injuries received in the automobile accident.  Tr. 543.  Plaintiff was fitted with a hard cervical collar for daily use, but was given a soft one to be worn while driving and sleeping.  Tr. 549.  She was also fitted with a sacroiliac belt to help stabilize the sacroiliac joints, and was instructed in its use.  *Id.*  Plaintiff was seen at Medig several more times in July 2015, with reports of cervical and lumbo-pelvic pain, and was provided physical therapy.  Tr. 550-61.  Plaintiff was also issued a TENS unit for pain management and was instructed on its use.  Tr. 552.

---

[4]  The hearing before the ALJ was held in April 2015.  Tr. 18.  The ALJ issued the Decision on September 4, 2015, and reviewed the medical records through Exhibit 16F, Tr. 535-61.  Tr. 26.

Plaintiff visited Dr. Scott's office on July 21, 2015, for neck pain with radiation into both arms.[5]  Tr. 565 (Exhibit 17F).  Plaintiff also reported difficulty with handwriting, grip and numbness in her right hand.  *Id.*  She reported that these symptoms worsened after the automobile accident.  *Id.* Plaintiff also reported midline back pain radiating into her ribs on the left side and a numbness along her rib cage, along with pain in both legs and generalized weakness in her legs.  *Id.*  Office notes indicate that Plaintiff had been scheduled for surgery regarding C6-7, but it was not completed due to insurance issues.  Tr. 565.

Neurological evaluation on that date showed the Plaintiff had intact strength of 4/5 throughout upper extremity with decreased grip bilaterally, worse on right; 4/5 right hip flexion; 3-4/5 throughout lower calf/feet. Tr. 567.  Regarding her gait, she had intact toe, heel, and tandem walking; SLR was +45 degrees on the right and 20 degrees on the left.  Range of motion was painful with flexion and extension.  She was unable to extend, but able to flex to 40 degrees.  She was diagnosed with cervical spine

---

[5]  Plaintiff indicates that the ALJ did not have these records when the decision was rendered in September 2015.  ECF No. 13 at 28.  The ALJ was aware, however, of the Plaintiff's June 21, 2015, car accident and records through July 15, 2015 (*see* Exhibit 16F).  Tr. 26, 34; *see supra* at n.4.  The medical records comprising Exhibit 17F and Plaintiff's representative's correspondence of February 19, 2016, Exhibit 15E, were presented to and considered by the Appeals Council.  Tr. 2-6, 240-44, 562-68.

arthrodesis and lumbar spine radiculopathy.  Tr. 567.  MRI scans were ordered as well as X-rays for spine flexion and extension.  *Id.*

On August 29, 2015, Plaintiff was again seen by Dr. Scott.  Tr. 562-68.  An August 25, 2015, MRI cervical scan showed postoperative changes at C4 through C6 where her anterior cervical fusion had been performed.  Tr. 562.  Moderate degenerative changes, stenosis, and mild foraminal narrowing were seen at C6-7.  Dr. Scott stated, "This is stable compared to the March 10, 2015[,] performed before the accident."  *Id.*  The thoracic MRI was a stable exam compared to the March 10, 2015, as well.  A mild disc bulge was seen above the fusion at C3-4 with no foraminal or canal stenosis.  *Id.*  The lumbar MRI showed mild degenerative changes at L3-4 and L4-5.  There was an annular fissure at L4-5.  *Id.*  Dr. Scott found that the disc osteophyte complex at C6-7 with moderately severe right foraminal narrowing would account for Plaintiff's C7 radicular pain.  He opined that the cervical spine condition was unchanged following the automobile accident, and recommended surgical intervention as he had on March 20, 2015.  Tr. 562.  As to her thoracic condition, Dr. Scott stated that he had referred that matter to Dr. Hoh who had evaluated Plaintiff for that condition.  Dr. Scott concluded that her lumbar problems were probably related to her automobile accident.  *Id.*  Dr. Scott indicated he would ask for

an evaluation by EMG/nerve conduction study of the lower extremities and right upper extremity, and would seek flexion/extension X-rays.  Tr. 563.

### B.  Hearing Testimony of Vocational Expert

At the hearing held on April 22, 2015, vocational expert David Jackson, Ph.D., testified that Plaintiff performed past relevant work as a secretary and teacher's aide.  Tr. 56.  He was asked to assume that an individual could perform with exertion demands of "light," with additional limitations: stand or walk four hours in an eight hour day; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; occasionally balance; frequently stoop, occasionally kneel, crouch, and crawl; occasionally bilaterally reach overhead; avoid concentrated exposure to wetness, humidity, fumes, odors, dust, gases, and poor ventilation; avoid even moderate exposure to vibration; and avoid concentrated exposure to hazards such as machinery and open, unprotected heights.  Tr. 56.

The vocational expert testified that, based on these criteria, Plaintiff could perform past work as a secretary and as a teacher's aide, as generally done.  Tr. 57-58.  When additional limitations were presented by Plaintiff's representative that the person would be limited to simple, routine tasks and limited overhead reaching, the vocational expert testified that the

person would not be able to perform the jobs of secretary and teacher's aide.  Tr. 28, 59.

Assuming limitations of simple and routine tasks and sit and stand, the vocational expert testified that there were other jobs that a person with all the stated limitations could perform, such as parking lot attendant (DOT 915.473-010), light exertional with SVP of 2; courier (DOT 230.663-010), light exertional with SVP of 2; and toll collector (DOT 211.462-038), light exertional with SVP of 2.[6]  Tr. 59-60.  The vocational expert testified that these jobs are present in significant numbers in the national economy - about 5,600 parking lot attendant jobs in Florida and 45,000 nationally; about 500 courier jobs in Florida and 10,000 nationally; and about 1,000 toll collector jobs in Florida and 20,000 nationally.  Tr. 60-61.  If the individual needed to spend 15 to 20 percent of the day away from the workstation lying down or otherwise seeking relief, this would significantly erode the occupational base, although a secretary job, teacher's aide job, or courier job could accommodate that need.  Tr. 63.  If the person were simply off task for greater than ten percent of the day, that would also eliminate toll booth collector and parking lot attendant.  Tr. 63-64.  Greater than ten

---

[6]  The vocational expert provided the corresponding Dictionary of Occupational Titles (DOT) codes for each of the jobs named.

percent of the day off task would start to erode the occupational base, and fifteen percent off task would significantly erode the occupational base. Tr. 64. If the individual were to miss two to three days a month due to illness, that would eliminate all work. Tr. 64.

### C. Other evidence

Plaintiff, who was 45 years of age, testified that she had a high school education and had worked in a clerical capacity for many years. Tr. 38-40. She has not worked at gainful employment since October 2012. She testified that she has chronic back and neck problems that have lasted for more than ten years, migraines, fibromyalgia, depression, anxiety, insomnia, asthma, TMJ, and a problem with her second toe that causes pain and keeps her from standing more than ten to fifteen minutes. Tr. 42, 46-47. She had been recommended for surgery on her neck and has already had neck fusion. Her neck problem causes shooting pains and numbness in her arms and hands. She testified that she has a herniated disc in her back that feels constantly like it is burning. Tr. 42-43. Her severe headaches occur sometimes multiple times a week but, even with medicine, occur on average three times a month. Tr. 44.

Plaintiff has asthma and uses a nebulizer. She is a smoker of three to four cigarettes a day. Tr. 44. Plaintiff testified that she cannot lift five

pounds and if she tries, she gets severe pain in her arms, and her hands become numb.  Tr. 46.  She testified that when sitting, she has to get up every five or ten minutes and move around to avoid leg numbness and back pain.  Tr. 47-48.  Plaintiff testified that she takes at least three hot showers a day and daily medication to help alleviate the pain.  Tr. 48-49.  Plaintiff testified her hands do not work correctly and she cannot button her clothes or grip things properly.  She takes frequent naps because she does not sleep well at night due to the pain.  Tr. 51.  She can drive, but not for long distances, and can grocery shop occasionally with use of an electric cart, but has difficulty reaching for items.  Tr. 52

Plaintiff's friend, James Holmes, provided written evidence dated April 25, 2015, that he has been in a relationship with Plaintiff for eight years and has witnessed her become frail and lose the ability to perform day-to-day activities.  Tr. 239.  He stated that she has lost strength and dexterity in her arms and hands and can no longer fish or endure a boat or truck ride.  He stated that he quit his job to help take care of her.  She has difficulty focusing and staying on task to perform daily domestic tasks.  Her condition has had an adverse effect on her depression.  She is much changed from when they first started dating, when she enjoyed visiting with friends, working around the house and yard, and playing with her dogs.  *Id.*

## II. Findings of the ALJ

The ALJ made several findings:

1. "The claimant meets the insured status requirements of the Social Security Act through December 31, 2017." Tr. 20.

2. "The claimant has not engaged in substantial gainful activity since October 4, 2012, the alleged onset date." *Id.*

3. "The claimant has the following severe impairments: history of anterior cervical discectomy and fusion at C4-6, migraine headaches, anxiety disorder, and depressive disorder." *Id.*

The ALJ noted that the impairments were found to be severe because they cause more than minimal limitation in the claimant's ability to engage in basic work activities. *Id.* The ALJ concluded that the report of fibromyalgia constituted a non-medically determinable impairment since the record fails to document tender point testing with digital palpation of an approximate force of nine pounds and lacks evidence of bilateral tender points as well as evidence that other disorders which could cause the claimants symptoms were excluded. Tr. 20-21. The ALJ also noted that treatment notes identify prescriptive treatment for hypertension and asthma, and treatment for those conditions was conservative with no evidence of objective findings of limitations. The ALJ found that the record did not establish abnormal foot bones. These impairments were found non-severe based on the lack of objective evidence to suggest they caused more than minimal limitation in ability to engage in basic work activities. Tr. 21.

4. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." *Id.*

The ALJ noted in part that the treatment history shows normal gait, consistently intact motor function and extremity strength, no atrophy, and overwhelmingly normal musculoskeletal range of motion. As to claimant's mental impairments, the ALJ noted that such impairment

only imposed a mild restriction on claimant's daily living and did not meet the criteria of "paragraph B." Tr. 21-22. To satisfy paragraph B criteria, the mental impairments must result in at least two of the following: marked restriction of activities in daily living; marked difficulties in concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. Tr. 21. The ALJ found Plaintiff had *mild* restriction in activities of daily living - she can drive, has adequate hygiene and appropriate dress; *mild* difficulties in social functioning, showing full orientation and intact, organized thought; and *moderate* difficulties in concentration, persistence or pace, with inability to keep attention affected by cervical pain or headaches. The ALJ found *no* episodes of decompensation that have been of extended duration. Tr. 21-22. The ALJ stated that the residual functional capacity assessment in section 5 reflects the degree of limitation the ALJ found in "paragraph B" of the mental function analysis. *Id.*

The ALJ found the criteria of "paragraph C" were not met because the record is devoid of evidence showing (1) a medically documented history of a chronic affective disorder of at least two years' duration that caused more than a minimal limitation of ability to do basic work activities; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or changes would be predicted to cause decompensation; and (3) a current history of one or more years of inability to function outside a highly supportive living arrangement. Tr. 22.

5. "After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except stand and/or walk four hours in an eight hour workday; occasionally climb ramp/stairs; occasionally climb ladders, ropes, or scaffolds; occasionally balance; frequently stoop; occasionally kneel, crouch, and crawl; overhead reaching is occasional, bilaterally; must avoid concentrated exposure to wetness, humidity, fumes, odors, dusts, gasses, poor ventilation; avoid moderate exposure to vibration; avoid concentrated exposure to hazards such as machinery and open unprotected heights; and, the claimant must be allowed the opportunity to sit or stand for two to three minutes at the workstation every 30-45 minutes, and work can still be performed during the

shifting period. Additionally, the claimant requires simple, routine tasks and instructions." Tr. 22-23.

The ALJ noted, in reaching this conclusion, that in Plaintiff's tele-claim process on February 19, 2013, she had no difficulty with understanding, coherency, concentration, and answering questions. Tr. 23. Although finding that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms" of constant pain with numbness that gains no relief from medication and pain management, the ALJ found that the claimant's statements and that of James Holmes concerning intensity, persistence, and limiting effect "are not entirely credible." Tr. 23-24. To support this finding, the ALJ cited lack of evidence in the record that Plaintiff cannot hold a fishing pole or ride in a truck because of chronic back, neck, and joint pain. Tr. 24. The ALJ stated that "the claimant's allegations appear extreme" in light of longitudinal medical history showing intact presentation. *Id.*

6. "The claimant is unable to perform any past relevant work (20 CFR 404.1565)." Tr. 28.

The ALJ noted that the vocational expert testified at the hearing that the mental limitations preclude a return to past relevant work. *Id.*

7. "The claimant was . . . was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1562)." *Id.*

8. "The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564)." *Id.*

9. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)." Tr. 29.

10. "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a))." *Id.*

Relying in large part on the vocational expert's testimony at the hearing, the ALJ found, based on all these factors, that the Plaintiff would be able to perform representative light unskilled work such as parking lot attendant (DOT 915.473-010), courier (DOT 230.663-010), and toll collector (DOT 211.462-038). Tr. 29. The ALJ found that Plaintiff was "not disabled" under the applicable rule.

11. "The claimant has not been under a disability, as defined in the Social Security Act, from October 4, 2012, through the date of this decision (20 CFR 404.1520(g))." Tr. 30.

The ALJ decided, based on the application filed on December 7, 2012, that

Plaintiff is not disabled under section 216(i) and 223(d) of the Social

Security Act. Tr. 30.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is

supported by substantial evidence in the record and premised upon correct

legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131

(11th Cir. 1986). "Substantial evidence is more than a scintilla, but less

than a preponderance. It is such relevant evidence as a reasonable person

would accept as adequate to support a conclusion." Bloodsworth v.

Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The

Commissioner's factual findings are conclusive if supported by substantial

evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002)

(citations omitted).[7]  The Court may not decide the facts anew, reweigh the

evidence, or substitute its judgment for that of the Commissioner,

<u>Bloodsworth</u>, 703 F.2d at 1239, although the Court must scrutinize the

entire record, consider evidence detracting from the evidence on which the

Commissioner relied, and determine the reasonableness of the factual

findings.  <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992); <u>Parker v.

Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986).  Review is deferential, but

the reviewing court conducts what has been referred to as "an independent

review of the record."  <u>Flynn v. Heckler</u>, 768 F.2d 1273, 1273 (11th Cir.

1985).

A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

---

[7]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to disability insurance benefits if she is under a disability prior to the expiration of her insured status.  *See* 42 U.S.C. § 423(a)(1)(A); Moore, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps, pursuant to 20 C.F.R. § 404.1520(a)(4)(i)-(v):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[8]

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work

---

[8] An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 404.1545(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term "*residual functional capacity assessment*" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

experience.  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1237 (11th Cir. 2004);

<u>Jones v. Apfel</u>, 190 F.3d 1224, 1229 (11th Cir. 1999); <u>Chester</u>, 792 F.2d at

131; <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986); 20

C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the Commissioner carries this

burden, the claimant must prove that he or she cannot perform the work

suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011

(11th Cir. 1987).

Plaintiff bears the burden of proving that she is disabled, and

consequently, is responsible for producing evidence in support of her claim.

*See* 20 C.F.R. § 404.1512(a); <u>Moore</u>, 405 F.3d at 1211.  The responsibility

of weighing the medical evidence and resolving any conflicts in the record

rests with the ALJ.  *See* <u>Battle v. Astrue</u>, 243 F. App'x 514, 523 (11th Cir.

2007) (unpublished).

The opinion of the claimant's treating physician must be accorded

considerable weight by the Commissioner unless good cause is shown to

the contrary.  <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).

This is so because treating physicians "are likely to be the medical

professionals most able to provide a detailed, longitudinal picture of [the

claimant's] medical impairment(s) and may bring a unique perspective to

the medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supported a contrary finding," the opinion is "conclusory or inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence or is wholly conclusory."  Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937

F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578,

582 (11th Cir. 1987)).  Where a treating physician has merely made

conclusory statements, the ALJ may afford them such weight to the extent

they are supported by clinical or laboratory findings and are consistent with

other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784

F.2d 1073, 1075 (11th Cir. 1986).

Some opinions, on issues such as whether the claimant is unable to

work, the claimant's RFC, and the application of vocational factors, "are not

medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive

of the case; i.e., that would direct the determination or decision of

disability."  20 C.F.R. § 404.1527(d); see Bell v. Bowen, 796 F.2d 1350,

1353-54 (11th Cir. 1986).  "[T]reating source opinions on issues reserved to

the Commissioner are never entitled to controlling weight or special

significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (1996).  Although

physicians' opinions about what a claimant can still do or the claimant's

restrictions are relevant evidence, such opinions are not determinative

because the ALJ has responsibility of assessing the claimant's RFC.  A

treating physician's opinion that a claimant is unable to work and is

necessarily disabled would not be entitled to any special weight or

deference.  The regulations expressly exclude such a disability opinion from the definition of a medical opinion because it is an issue reserved to the Commissioner and a medical source is not given "any special significance" with respect to issues reserved to the Commissioner, such as disability.  20 C.F.R. § 404.1527(d)(1), (3); SSR 96-5p, 1996 SSR LEXIS 2, at *6.  In Lewis, the court noted "that we are concerned here with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinion of the legal consequences of his condition.  Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings."  125 F.3d at 1440.

Generally, more weight is given to the opinion of a specialist "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 404.1527(c)(2), (5); *see also* Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that "[s]pecialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community," thus rheumatologists' opinions were entitled to greater weight than those of other physicians) (Benecke quoted in Somogy v. Comm'r of Soc. Sec., 366 F. App'x 56, 65 n.13 (11th Cir. 2010)

(unpublished)).  Although a claimant may provide a statement containing a

treating physician's opinion of her remaining capabilities, the ALJ must

evaluate such a statement in light of the other evidence presented and the

ALJ must make the ultimate determination of disability.  20 C.F.R.

§§ 404.1512, 404.1513, 404.1527, 404.1545.

## IV.  Legal Analysis

Plaintiff raises three issues:

I. The Commissioner confused Plaintiff's cervical spine and thoracic spine conditions and failed to realize that the treating neurosurgeon since 2009, Dr. Eric Scott, recommended a second cervical spine fusion in March 2015 due to the progression in the 2015 cervical spine MRI findings and his opinion was uncontradicted. The Commissioner failed to address Dr. Scott's opinion that the 2015 cervical spine findings "undoubtedly account[ed] for her C7 radicular pain."

II. The Commissioner failed to properly address the opinion of Kim Nguyen, PA-C and Dr. Lewis as far as Plaintiff's limitations after the 2015 accident.

III. New and material evidence dated prior to the date of the Commissioner's decision contradicts the Commissioner's findings that Plaintiff's 2015 accident did not increase her level of impairment and that she only had a severe cervical spine condition.

ECF No. 13 at 1-2.

### A. Dr. Eric Scott

Plaintiff contends that the ALJ failed to acknowledge and assign

appropriate weight to the uncontradicted opinion of Dr. Scott, who was not

just an "examiner," but was Plaintiff's treating neurosurgeon since 2009.  In

rejecting the opinion of Dr. Scott that Plaintiff needed further surgery, the

ALJ stated in pertinent part in the decision:

> More recently, on March 20, 2015, the claimant received
> neurological testing that showed no evidence of complicating
> processes within the claimant's cervical spine, despite some
> signs of degenerative changes (Exhibit 14F).  During testing,
> the claimant presented positive on clinical tests for weakness.
> Her examiner recommended further surgery, but made no
> guarantees it would resolve the claimant's reports of pain
> (Exhibit 14F).  Records notate a separate treating source
> recommended against surgery and declining to provide pain
> management treatments (Exhibit 14F).

Tr. 26.

Exhibit 14F, which was referred to by the ALJ, included office notes of

Plaintiff's treating neurosurgeon Eric Scott, M.D., made after a March 20,

2015, follow-up visit by Plaintiff subsequent to an MRI of her cervical and

thoracic spine.  Tr. 530-33.  Dr. Scott's opinion concerning Plaintiff's

cervical spine, as opposed to Dr. Hoh's opinion which addressed her

thoracic spine, was that based on the 2015 cervical spine MRI, moderate

degenerative change was revealed at C6-7 with bilateral foraminal

narrowing, mild on the left and moderate to advanced on the right, and that

the foraminal narrowing was "rather severe."  Tr. 530.  He stated, "This

undoubtedly accounts for her C7 radicular pain."  *Id.*  (Exhibit 14F at 1).

Dr. Scott recommended an anterior cervical discectomy and fusion at C6-7 using PEEK cage and LDR-ROI-C system. *Id.* The ALJ does not expressly identify the "treating source" who recommended against surgery, but Dr. Scott's notes from February 17, 2015, mention that he had referred Plaintiff to Dr. Daniel Hoh to evaluate her thoracic spine. Tr. 531 (Exhibit 14F at 2); Tr. 502 (Exhibit 11F at 1).

Dr. Scott noted that the diagnostic studies show Plaintiff's thoracic disc herniation appears unchanged, but that the "cervical disc osteophyte complex at C6-7 has progressed with rather severe foraminal narrowing on the right, moderate on the left." Tr. 530. He notes that Dr. Hoh recommended against thoracic surgery because he found no myelopathy. After seeing Plaintiff, Dr. Hoh stated on May 23, 2014, "Given that she is neurologically intact without any signs of myelopathy and has had this known thoracic disc herniation since 2009, I do not see any absolute indication for surgical treatment at this time." Tr. 502 (Exhibit 11F at 1). As to Plaintiff's 2015 cervical spine study, Dr. Scott concluded that Plaintiff did have possible cervical myelopathy, and he did recommend surgery for her cervical disc osteophyte complex at C6-7. Tr. 530.

Assuming the ALJ's unidentified treating source cited for a recommendation against surgery was Dr. Hoh, the ALJ has confused the

recommendations concerning cervical spine surgery and thoracic spine surgery.  In doing so, the ALJ has failed to explain a sufficient basis for rejection of the opinion of Dr. Scott, Plaintiff's long-time treating physician, that cervical surgery was recommended.  As noted earlier, an opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis, 125 F.3d at 1440.  The reason for giving little weight to the opinion of the treating physician must be supported by substantial evidence.  Marbury, 957 F.2d at 841.  The ALJ may discount the treating physician's opinion if good cause exists, which includes when the evidence "supported a contrary finding" or the opinion is "conclusory or inconsistent with [the treating physician's] own medical records."  Lewis, 125 F.3d at 1440.  In this case, good cause has not been shown for rejection of Dr. Scott's opinion regarding the need for surgery.  Dr. Hoh's recommendation against thoracic spine surgery is not evidence supporting a contrary conclusion regarding Dr. Scott's findings and recommendation as to cervical spine surgery; nor was Dr. Scott's findings and recommendation inconsistent with his own medical records.

"To the extent that an administrative law judge commits an error, the error is harmless if it did not affect the judge's ultimate determination."

Hunter v. Comm'r of Soc. Sec., 609 F. App'x 555, 558 (11th Cir. 2015)

(unpublished) (citing Diorio v. Heckler, 721 F. 2d 726, 728 (11th Cir. 1983));

Delia v. Comm'r of Soc. Sec., 433 F. App'x 885, 887 (11th Cir. 2011)

(unpublished) (applying harmless error analysis to Social Security disability

benefits claim).  Even crediting Dr. Scott's conclusions and opinions

regarding Plaintiff's cervical condition and whether surgery was

recommended, remand is not required because those conclusions and

opinions are not in conflict with the ALJ's findings.  *See* Patterson v.

Bowen, 799 F.2d 1455, 1459 (11th Cir. 1986) (stating remand is

inappropriate when the error is harmless because correcting it would not

change the outcome of the ALJ's findings); Moore v. Astrue, 256 F. App'x

330, 332-33 (11th Cir. 2007) (unpublished) (citing Patterson).

 The ALJ ultimately concluded that Plaintiff has the residual functional

capacity to perform light work with additional restrictions.  Tr. 22-28.  In

reaching this conclusion, the ALJ found that Plaintiff has severe

impairments based on a history of anterior cervical discectomy and fusion

at C4-6, migraine headaches, anxiety disorder, and depressive disorder.

Tr. 20.  The ALJ also found Plaintiff is unable to perform past relevant work,

but could perform light work with additional limitations.  Those additional

limitations included the requirement that Plaintiff be allowed the opportunity

to sit or stand at the workstation every 30-45 minutes and be expected to perform no more than simple, routine tasks. Tr. 23. Her RFC also is limited to her walking or standing no more than four hours in an eight-hour workday, only occasional climbing, balancing, kneeling, crouching, crawling, or reaching overhead. Frequent stooping was allowed. Tr. 22. Other limitations on the RCF of light work were avoiding concentrated exposure to adverse environmental and workplace conditions. Tr. 23.

These findings are supported by substantial evidence in the record and are not in conflict with Dr. Scott's opinions. The ALJ cites medical records that show in 2012, even though Plaintiff continued to report headaches, she was gainfully employed as a secretary up until her alleged date of disability in October 2012. Tr. 77. The ALJ correctly found that the medical records showed no acute hardware complications. Dr. Scott's notes from August 14, 2012, indicate no complicating features in the "Angi x-rays" showing the C4-6 fusion. Tr. 263; Tr. 469.

In March 2013, Dr. Chodosh performed a consultative examination. Tr. 432-39. Motor function was found grossly normal, all four extremities, with strength judged 5/5 throughout, including grips. Manual dexterity was found to be normal with ability to write, and to remove and replace a screw

cap on a small bottle.  Tr. 434.  Testing showed limited range for cervical

spine forward flexion and limited range in lumbar spine forward flexion.

Tr. 436.  Standing balance and gait was normal and Plaintiff indicated an

ability to squat and rise, although squatting was difficult due knee pain.

Tr. 433, 435.  Plaintiff was found to be able to drive with frequent rest

breaks.  Tr. 433.  Dr. Chodosh concluded that, based on the objective

evidence, Plaintiff could stand, walk, sit, stoop, squat, kneel, lift, carry,

handle objects, see, hear, and speak normally.  Tr. 435.

In May 2014, Dr. Hoh examined Plaintiff on reference from Dr. Scott

for mid back pain and noted that she has been treated conservatively.

Tr. 503.  Her main complaint was "focal mid back pain.  She does report

some paresthesias around her left flank as well as left leg.  She denies any

motor deficits, no bowel or bladder complaints.  She denies any gait

difficulty."  *Id.*  She was not taking any pain medications.  *Id.*  The physical

examination revealed that her independent and tandem gait (with antalgic

gait) were normal; station stable; and no evidence of dislocation,

subluxation, or laxity.  Toe and heel walking were normal.  Tr. 505.  Her

right and left upper extremities showed a normal range of motion.  *Id.*  Her

lower extremities also showed a normal range of motion.  *Id.*  Her spine

was reported to have a normal range of motion.  *Id.*  Dr. Hoh found no

decrease in sensation in her arms and legs to touch. Tr. 506. Her thoracic MRI showed a disc herniation at T10-11, which was slightly increased from 2009, but concluded there was no "absolute indication for surgical treatment" of her thoracic spine at that time. Tr. 507.

On March 10, 2015, a cervical study showed no evidence of complicating process at the cervical fusion site, C4 thru C6. Tr. 530. Dr. Scott confirmed this in his August 29, 2015, notes. Tr. 562. A cervical scan of August 25, 2015, showed moderate degenerative change in C6-7 and her MRI was stable compared to a pre-accident MRI. Tr. 530. Mild degenerative changes were seen in her lumbar spine at L3-4 and L4-5. *Id.* The thoracic MRI was also stable when compared to a pre-accident scan. *Id.*

Records from an examination on July 21, 2015, post-accident, indicated that Plaintiff demonstrated intact strength 4/5 throughout upper extremity, with decreased grip bilaterally, worse on the right than the left. Tr. 567. She demonstrated 4/5 hip flexion, 3-4/5 throughout lower calf/feet. Her gait was intact and toe, heel, and tandem walking were also intact. She had tender cervical, thoracic, and lumbar spine issues. She had difficulty with straight leg raise, painful with extension and flexion. *Id.*

As Plaintiff argues, Dr. Scott continued to recommend cervical fusion at C6-7, but Dr. Scott's continued recommendation for cervical spine surgery is not in conflict with the ALJ's findings that Plaintiff could perform light work with additional limitations, which is supported by the record.

The error of the ALJ in confusing Dr. Scott's recommendation regarding cervical fusion surgery with Dr. Hoh's recommendation against thoracic surgery was harmless because that recommendation is not in conflict with, and did not contradict, the ALJ's findings based on substantial evidence in the record. For this reason, remand based on the ALJ's confusion of the two recommendations is not warranted.

### B. Opinion of Kim Nguyen, PA-C, and Dr. Adrian Lewis

Plaintiff next contends that the Commissioner failed to properly address the opinion of Kim Nguyen, PA-C, and supervising physician, Dr. Adrian Lewis, at Medig Medical Injury Group concerning Plaintiff's limitations after the 2015 accident. ECF No. 13 at 24-28. Plaintiff argues that the ALJ mentioned the records of Plaintiff's treatment at Medig, but erroneously concluded that no treating source makes findings precluding light activities or tasks on a daily basis. *Id.* at 24. Regarding Plaintiff's treatment at Medig, the ALJ stated:

> On June 21, 2015, records indicate the claimant had a car accident (Exhibit 16F). Despite this accident, the claimant

presented without radicular pain and discomfort. Treating sources recommended braces, proper body mechanics, and posture, but indicated the claimant remained able to complete activities of daily living (Exhibit 16F/16). She underwent physical therapy and TENS treatment (Exhibit 16F), and overall, appeared to progress/improve with therapy and pain management (Exhibit 16F). Around this time, the claimant underwent radiology to follow up on reports of hand pain and asthma (Exhibit 15F). Although the record concludes with the claimant in physical therapy, there is nothing to suggest her recovery would last more than a year, and no treating source makes finding precluding light activities or tasks on a daily basis.

Tr. 26.

Medig records indicate that Kim Nguyen, supervised by Dr. Lewis, would be seeing Plaintiff solely for accident-related injuries. Tr. 536. She identifies portions of the Medig medical records that indicate, after a detailed evaluation of Plaintiff, that "general restrictions" were placed on her activities, including not lifting more than ten pounds, no lifting either arm above shoulder height, no repetitive twisting, and no repetitive pushing or pulling. Tr. 542. These limitations were stated in the records of the initial June 24, 2015, visit, but were not repeated in the records of subsequent visits on June 30, July 7, July 9, or July 14, or July 16, 2015. Tr. 546-49 (June 30, 2015, treatment goals); 551-53 (July 7, 2015); 555 (July 9, 2015, "Patient is progressing appropriately."); 558 (July 14, 2015, (same); and 559 (July 16, 2015, "Patient responding slower than anticipated.") The

records do not clearly indicate that the limitations were intended to be permanent or last more than one year. The ALJ did not discuss these stated limitations, but correctly concluded that nothing in the opinions of Kim Nguyen, and Dr. Adrian Lewis precluded light activities on a daily basis.

Plaintiff also contends that the ALJ incorrectly interpreted the records of Medig to say that Plaintiff remained able to complete activities of daily living. Tr. 26 (Decision citing Exhibit 16F at 16). That portion of the records, described as "Treatment Plan," lists actions that will be taken, or should be taken by the Plaintiff, toward recovering from the automobile accident. It states, in part, that the patient will be educated regarding proper body mechanics and posture to decrease risk of further injury. Tr. 550. It describes therapy that will be performed on Plaintiff's joints and soft tissues when appropriate, and other manipulation and techniques that will be employed. It further prescribes a sacroiliac belt and hard and soft collars to help stabilize areas of Plaintiff's joints and cervical ligaments. *Id.* The treatment plan states that Plaintiff will be instructed in a customized exercise program to assist in restoring range of motion, strength, flexibility, proprioception, and stability, and to restore normal gait and balance. *Id.* Although the page of Medig notes cited by the ALJ does not state in

express terms that Plaintiff remained able to complete activities of daily living, the treatment plan indicates that it was aimed at restoring that ability and supports the reasonable inference that the medical personnel believed such could be achieved by way of the therapies, techniques, and modalities prescribed.

The ALJ's interpretation of the Medig records, when considered in light of the other medical evidence, was not substantially incorrect and does not require remand for reconsideration of the opinions or other notes and records of Kim Nuygen or Dr. Lewis.

## C.  New evidence arising after the hearing

Plaintiff contends that new and material evidence dated after the hearing, but received prior to the date of the Commissioner's decision, and which was not reviewed by the ALJ, contradicts the Commissioner's findings that the accident did not increase Plaintiff's level of impairment and that she only had a severe cervical spine condition.  ECF No. 13 at 28-31. The hearing was held in April 2015.  In June 2015, Plaintiff was in an automobile accident.  In July and August of 2015, prior to the decision of the ALJ, Plaintiff saw Dr. Scott and had MRI studies of her cervical, lumbar, and thoracic spine.  *Id.* at 28.  This additional evidence was submitted to

the Appeals Council and Plaintiff contends that it requires remand because Dr. Scott's opinion conflicts with the ALJ's findings.  ECF No. 13 at 28-29.

The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if the ALJ's action, findings, or conclusions are contrary to the weight of the evidence currently in the record.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1261 (11th Cir. 2007).  The Appeals Council denied review in this case, stating that it considered the additional evidence and found that it does not provide a basis for changing the ALJ's decision.  Tr. 2-5.  When a claimant presents new evidence to the Appeals Council and review is denied, the court will consider the claimant's evidence anew to determine whether the new evidence renders the denial of benefits erroneous.  Id. at 1262.  Under these circumstances, there are two methods for remanding a case back to the Commissioner, known as "sentence four remands" and "sentence six remands," referring to the provisions of 42 U.S.C. § 405(g).  Id. at 1261.  To obtain a "sentence four" remand, the claimant must show that, in light of the new evidence submitted to the Appeals Council, the

ALJ's decision to deny benefits is not supported by substantial evidence in the record as a whole.[9] Ingram, 496 F.3d at 1266-67.

Plaintiff contends that if the ALJ had been able to review the new evidence arising after the hearing, Tr. 562-68, Exhibit 17F, but before the ALJ's decision, there is a reasonable possibility that Plaintiff would have been awarded benefits, at least as of the date of the automobile accident. ECF No. 13 at 29. Plaintiff further contends that the ALJ incorrectly presumed that her condition after the accident did not worsen her level of impairment, and that the records of Dr. Scott, who saw Plaintiff after the Medig treatment, would demonstrate that Plaintiff's condition had worsened.

Dr. Scott saw Plaintiff in July 2015 and found her with decreased grip bilaterally, worse on the right, and mild spasm to palpation. Tr. 565. She was diagnosed at that time with cervical spine arthrodesis and lumbar spine radiculopathy, and was referred for X-rays and an MRI. Id. Office notes also indicate Plaintiff's range of motion was painful with flexion and

---

[9] "The sixth sentence of § 405(g) provides a federal court the power to remand the application for benefits to the Commissioner for the taking of additional evidence upon a showing 'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" Ingram, 496 F.3d at 1261.

extension, and she was unable to extend.  She could flex to 40 degrees.
Her SLR was +45 degrees on the right and 20 degrees on the left.  Tr. 567.

On August 29, 2015, Plaintiff was again seen by Dr. Scott.  Tr. 562-
68.  Regarding an August 25, 2015, MRI cervical scan, Dr. Scott noted that
it showed postoperative changes at C4 through C6 where her anterior
cervical fusion had been performed.  Tr. 562.  He notes no evidence for
complicating process; central canal and foramina are patent.  *Id.*  Moderate
degenerative changes, stenosis, and mild foraminal narrowing were seen
at C6-7.  Dr. Scott stated, however, "This is stable compared to the March
10, 2015 performed before the accident."  *Id.*  The thoracic MRI was said to
be a stable exam compared to the March 10, 2015, as well.  A mild disc
bulge was seen above the fusion at C3-4 with no foraminal or canal
stenosis.  *Id.*  The lumbar MRI showed mild degenerative changes at L3-4
and L4-5.  *Id.*  Dr. Scott found that the disc osteophyte complex at C6-7
with moderately severe right foraminal narrowing would account for
Plaintiff's C7 radicular pain.[10]  He also opined that "the cervical spine
condition is stale [sic] and unchanged following the automobile accident"
and recommended surgical intervention remained unchanged as he had on

---

[10]  Radiating pain was not new to Plaintiff after the accident.  Dr. Scott treated
Plaintiff on August 14, 2012, for neck pain with radiation into both arms and intermittent
numbness in the right arm.  Tr. 263-68.

March 20, 2015.  Tr. 562.  He also opined that the thoracic disc protrusion is unchanged following the accident.  *Id.*  His recommendation regarding the lumbar spine disc protrusion annular fissure at L4-5 appears to be that it was "probably related to the accident in question."  She could "discontinue her cervical collar."  *Id.*

Plaintiff has not demonstrated that the additional evidence contained in Exhibit 17F conflicts with the ALJ's conclusion that Plaintiff improved after her automobile accident and the physical therapy and treatment received from Medig.  Tr. 26.  The ALJ also correctly concluded that no treating source makes findings precluding light activities or tasks on a daily basis.  *Id.*  Although Dr. Scott noted in August that the disc osteophyte complex at C6-7 with moderately severe right foraminal narrowing would account for her C7 radicular pain, he also concluded that the cervical spine condition is stable and unchanged following the accident, and that her thoracic disc protrusion is unchanged following the accident.  Tr. 562. Office notes from July 2015 indicated that Plaintiff had intact strength 4/5 throughout upper extremity with some decreased grip.  Tr. 567.  Her gait was intact.  *Id.*  This evidence is not in conflict with the ALJ's determination that Plaintiff could perform light activities or tasks on a daily basis.

Accordingly, remand is not required for reconsideration of Dr. Scott's records for July and August of 2015. Moreover, the Appeals Council was provided these records and concluded that the new evidence did not provide a basis for changing the ALJ's decision. Tr. 3. The additional limitations placed on Plaintiff's expected light work, including limitations on standing and walking, and only occasionally climbing, kneeling, crouching and crawling, and only occasional overhead reaching, take into account the medical findings concerning Plaintiff's spinal condition as described throughout the record, including the new evidence submitted to the Appeals Council.

## V. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law. Accordingly, the decision of the Commissioner to deny Plaintiff's application for Social Security disability benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for the Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on June 22, 2017.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**